UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| | : | |
| Alfred Pilotte, through his Guardian | : | |
| The Office of Public Guardian | : | |
| | : | |
| v. | : | |
| | : | Civil Action No.  21-CV-00749 |
| Berlin Police Department | : | |
| | : | |

## DEFENDANT CITY OF BERLIN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant City of Berlin by its attorneys, Cullen Collimore Shirley, pllc, and respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## INTRODUCTION

This case stems from an impulsive act of one Berlin Police Officer – former Defendant Philip Pelletier – who while working a detail at Androscoggin Valley Hospital recorded three images of Plaintiff Alfred Pilotte on his personal phone and sent them to a small number of friends, including two at the Berlin Police Department.  Pelletier's conduct was investigated, and he was not merely disciplined but terminated and referred for potential prosecution.  He later pled guilty to one count of criminal invasion of privacy.

Although Plaintiff began this action by suing Pelletier and the City of Berlin, Plaintiff voluntarily dismissed the claims against Pelletier after Pelletier signed a sworn declaration – prepared by Plaintiff's counsel – blaming the City of Berlin for his actions (hereinafter, "Declaration").  Plaintiff now proceeds against the City on three claims:

Count II: §1983 *Monell* Claim;

Count III: Title II ADA Claim; and

County IV: "Voluntary Assumption of Duty"

As set forth below, the Declaration is insufficient to overcome the barriers to municipal liability in this case, and the City is entitled to summary judgment on each of these claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

*City of Berlin Police Department*

The City of Berlin has a Police Department ("Department" or "BPD") which consists of a Chief, Deputy Chief or Captain, and generally between 22 and 25 full-time and several part-time officers across a range of ranks.  Affidavit of Chief Daniel Buteau ("Buteau Aff."), attached hereto as Exhibit A ¶3.[1]  As of January 2019 the Department's Chief was Peter Morency and its Deputy Chief was Daniel Buteau.  *Id*. ¶4.  There were several Lieutenants, including Timothy Godin and Kerry Therriault, and two or three Sergeants. *Id*.  The remaining officers were held the ranks of either Detective, Corporal, or Patrolman.  *Id*.  Like most police departments, the BPD operated on military style chain of command structure. *Id*. ¶5.

The Department issues Standard Operating Procedures ("SOP") on a wide variety of topics, including the use of force, arrest procedures, and harassment.  Buteau Aff. ¶6.  In January 2019 there were also specific SOPs on Use of Social Networking and Media and Personal Communication Devices ("Social Media SOP") and Rules of Conduct.  *Id*. ¶7 and Exhibits 1 and 2 to same.  The Social Media SOP warned employees of the dangers of posting online and provided in pertinent part:

> BPD employees are by this policy notified and reminded that all matters of, by, within, and about BPD, details regarding the calls we service, and the customers and user agencies we interact with, are generally considered confidential information which may not be released, blogged about, posted, or otherwise

---

[1]     Buteau has been promoted to Chief of Police since this incident.  For clarity, Defendant will refer to him as Deputy Chief throughout this Memorandum reflecting the position he held at the time of the underlying events.

> shared outside the department without prior authorization . . . . Posting or sharing by BPD employees of confidential internal information via social networking or social media sites will normally be considered to be in violation of this policy, whether such posting or sharing occurs while on or off duty.

Buteau Ex. 1 at Sections VI, VIII.  The Rules of Conduct SOP provided that officers must be familiar with the policies and procedures of the Department.  Buteau Ex. 2 at II(A)(13)(17). Officers were warned that conduct unbecoming of an officer – including any conduct that brings the Department into disrepute – was prohibited.  *Id*. at II(B)(2).

The Department also had an SOP on Mental Illness, which recognized mental illness as a disease and those with mental illness as deserving "empathy, respect, and assistance."  Buteau Aff. ¶8 and Exhibit 3 thereto, at Section III.  The SOP specifically required that:

> Berlin Police Department employees shall afford people who have mental illnesses the same rights, dignity and access to police and other governmental and community services as are provided to all citizens.

*Id*. at Section II.

All officers are required to review the SOPs.  Buteau Aff. ¶9.  In addition, the Department updates the policies from time to time and informs employees of those changes.  *Id*. At times, the Department will underscore the importance of a specific SOP through roll call or correspondence.  *Id*.  The Department did so in relation to the Social Media SOP in April 2017 when Dep. Chief Buteau emailed the Department's employees to reinforce that policy.  *Id*.

The Department enforces its SOPs through a formal disciplinary process**.**  Buteau Aff. ¶ 10 and Exhibit 4 thereto.  The policy provides for progressive discipline, but a serious infraction can lead to demotion or even dismissal.  Buteau Ex. 4 at Section II.  The Deputy Chief is typically the one to initiate internal affairs investigations, although other supervisors may do so on minor infractions.  Buteau Aff. ¶10.  In addition, the Department conducts annual evaluations of its officers to ensure that they are maintaining departmental standards.  Buteau Aff. ¶11.

Those evaluations can result in requirements for additional training or improvement.  *Id.*

*Hiring of Philip Pelletier*

Philip Pelletier grew up in Berlin, graduating from high school there in 2007 and joining the Marines shortly after.  Deposition of Philip Pelletier ("Pelletier Dep."), relevant portions of which are attached hereto as <u>Exhibit</u> <u>B</u>, at 11.  After four years of active duty – including a combat role in Afghanistan – he was honorably discharged and returned to New Hampshire, where he secured a full-time position as an officer with the Gorham Police Department in 2013. *Id.* at 12, 16.  He participated in Field Training for about two months and attended the full-time police academy through Gorham.  *Id.* at 17.

The Berlin Police Department actively recruits both new and experienced officers. Buteau Aff. ¶12.  The hiring process includes checking the applicant's background and a physical examination, among other things.  *Id.*  For experienced officers, the Department would review their personnel file from their current agency and the background checks conducted in relation to that.  *Id.*

In August of 2015 Pelletier was hired as a full-time officer for the BPD.  Buteau Aff. ¶13. Nothing in his review raised any concerns or red flags with the Department about Pelletier's prior conduct, nor has the Department subsequently learned of any prior misconduct.  *Id.*  Once hired, he underwent further Field Training, which included reviewing the Department's SOPs. Pelletier Dep. at 21; Buteau Aff. ¶14.  He specifically acknowledged having reviewed SOPs pertaining to Social Media, Mental Health, and Rules of Conduct.  *Id.*  He also swore an oath to perform his duties consistently with the state and municipal law and the Constitution.  *Id.* ¶15. Thereafter, Pelletier received regular training through the Department, including annual use of force and firearms training.  *Id.*

The Department had regular monthly meetings in which policies and other law enforcement issues were frequently discussed. Buteau Aff. ¶16. The Department often sends officers to outside trainings that appear pertinent to its functions and officers were encouraged to attend outside trainings. *Id.* Pelletier attended training outside the Department, including a full day class on dealing with emotionally disturbed persons in December 2016. *Id.*

By January 2019 Pelletier had been with the Department for over three years. Buteau Aff. ¶14. He had received annual evaluations achieving generally good marks. *Id.* ¶17. He had a handful of commendations for his work. *Id.* On one occasion Pelletier was given Counseling, a low level of discipline, when he was found to have posted a photo in violation of the Social Media SOP. Pelletier Dep. at 60-61. In addition, a man named Jesse Chapman complained that Pelletier had improperly stopped him in October 2018. Buteau Aff. ¶18. The Complaint did not involve the use of social media, the distribution of recorded images, or the treatment of someone with mental illness. *Id.* The complaint was reviewed by the Department. *Id.*

### Alfred Pilotte

Plaintiff Alfred Pilotte is an adult, white male who resides in Berlin. Buteau Aff. ¶19. He is well known to the Department. *Id.* He suffers from severe mental illness. Complaint ¶13. In addition to being under the care of the Office of Public Guardian, Plaintiff's care is managed by Northern Human Services ("NHS"). Deposition of Matthew Boucher ("Boucher Dep."), relevant experts of which are attached hereto as <u>Exhibit C</u>, at 21. Since at least 2013, Plaintiff had a Conditional Discharge from New Hampshire Hospital. *Id.* at 15, 22-23. If Plaintiff failed to take his medication as prescribed or otherwise violated the terms of the Conditional Discharge, NHS would initiate a revocation of the Conditional Discharge, in which case Plaintiff would have to be taken to the local hospital to see a clinician. Boucher Dep. at 21-23. If the

clinician determined that Plaintiff Conditional Discharge is up for revocation, he must remain in the hospital until a bed opens up at New Hampshire Hospital. *Id*. at 61.

The local hospital in Berlin is Androscoggin Valley Hospital ("AVH"). Buteau Aff. ¶20. Unfortunately, AVH does not have a mental health ward or psychiatric unit. Boucher Dep. at 31. As a result, when Mr. Pilotte is admitted, he is placed in a regular, unlocked room on the floor with other patients. Buteau Aff. ¶20. Because Mr. Pilotte has a history of volatile behavior, AVH contracts with the City to provide a round-the-clock police presence as a private detail. *Id*. ¶21. *See also* Pelletier Dep. at 31 (noting Plaintiff's history of assaultive behavior towards staff). The purpose of these details was to protect hospital staff. Buteau Aff. ¶21. During the detail, an officer would be stationed outside Plaintiff's hospital door. *Id*. The officer would only enter the room to assist staff as needed. *Id*. Because NHH frequently did not have an available bed, these details could last days or even weeks. *Id*. ¶22; *see also* Boucher Dep. at 26 (noting 10-day stay in AVH). AVH paid the City for these services. Buteau Aff. ¶22. Other patients also triggered a request for similar services. Pelletier Dep. at 34.

*January 2019 Incident*

On or about January 17, 2019, Plaintiff's conditional discharge was revoked. Buteau Aff. ¶23. On January 21, 2019, Berlin Officers Zach Howry and Eoin Stapleton contacted Plaintiff at his home. *Id*. He was brought to AVH and, as usual, housed on a general unit. Pelletier Dep. at 36. AVH requested a police security detail. Buteau Aff. ¶23.

Pelletier volunteered to take a shift on or about January 22, 2019. Pelletier Dep. at 34; Declaration at ¶2. While there, Pelletier recorded images of Plaintiff – either still photos or video - using his personal cell phone. Pelletier Dep. at 10; Declaration ¶ 3. At some point, he distributed some such images to a small number of friends of his, including two Berlin police

officers – Officer Eoin Stapleton and Officer Eric Benjamin. Deposition of Eric Benjamin ("Benjamin Dep."), relevant portions of which are attached hereto as <u>Exhibit D</u>, at 22 (acknowledging receiving one video); Deposition of Eoin Stapleton ("Stapleton Dep."), relevant portions of which are attached hereto as <u>Exhibit E</u>, at 33, 46-48. Officer Benjamin received the images via Snapchat. Benjamin Dep. at 28-29. Officer Stapleton received his via text. Stapleton Dep. at 33. In the video, Plaintiff was unclothed. Stapleton Dep. at 46. Stapleton immediately deleted that image. Stapleton Dep. at 48-49. Benjamin did not see any depiction of Plaintiff in the nude. Benjamin Dep. at 28-29.

### Investigation and Discipline

At a shift change, Officer Stapleton informed his supervisor, Corporal Joseph Priest, that he had received a photographic image of Plaintiff from Pelletier. Stapleton Dep. at 72-73. Priest also informed Lt. Godin of the matter. Deposition of Joseph Priest ("Priest Dep."), relevant portions of which are attached hereto as <u>Exhibit F</u>, at 17. Lt. Godin duly reported the matter to Dep. Chief Buteau in late January 2019. Buteau Aff. ¶24. The Deputy Chief does not recall whether Lt. Godin stated that Plaintiff was unclothed in any such image. Buteau Aff. ¶24. In his nearly 20 years on the force the Dep. Chief had never before heard of any officer – including Pelletier – improperly recording or distributing images of Plaintiff or any patient at AVH. *Id.*

Dep. Chief Buteau asked Lt. Godin to gather additional, first-hand information about the incident. Buteau Aff. ¶ 25. Unfortunately, Lt. Godin, who was preparing to leave the Department, did not provide any additional information to the Deputy Chief. *Id.* ¶25. The matter did not, however, die on the vine. Upon Lt. Godin's retirement at the end of February 2019, Dep. Chief Buteau assigned Lt. Theriault to the task. *Id.* Lt. Theriault interviewed Benjamin, Stapleton, and Officer Zach Howry and obtained written statements from each.

Benjamin Dep. at 43-33, Stapleton Dep. at 45, and Deposition of Zach Howry ("Howry Dep."), relevant portions of which are attached hereto as <u>Exhibit G</u>, at 31-32.  He also interviewed Priest and Officer John Imperial.  Priest Dep. at 21; Deposition of John Imperial ("Imperial Dep."), relevant portions of which are attached hereto as <u>Exhibit H</u> at 35-36.

After the interviews were conducted and the statements were obtained, the Chief and Dep. Chief then met with Pelletier.  Buteau Aff. ¶26.  Pelletier acknowledged having taken an image of Plaintiff and sending it to another officer.  *Id*.  He later provided a signed statement confirming that he had taken a video of Plaintiff and sent it to another officer.  Pelletier Dep. at 49 and <u>Ex. 6</u> thereto.  He expressed his regret for his "poor decision and lack of understanding of future consequences," and undertook "to use better judgment and think about my actions and consequences in the future."  *Id*.

*Pelletier Resignation and Prosecution*

Pelletier's promise to improve was not enough to save his job**.**  On April 10, 2019, the Chief and Deputy Chief met with the County Attorney to discuss the matter.  Buteau Aff. ¶27.  The following day, the Department suspended Pelletier and referred the matter to the Grafton County Sheriff's Office for criminal investigation.  *Id*.  The Deputy Chief also advised the Bureau of Elderly and Adult Services of the incident.  *Id*.  On April 17, 2019, Pelletier was informed that the Chief would be recommending termination.  Pelletier Dep. at 51-52.  The following day he resigned from the Department.  Pelletier Dep. at 52 and <u>Exhibit 9</u> thereto.  Even so, the Department reported his resignation as being one "in lieu of termination."  Buteau Aff. ¶28.  Although the County Attorney declined to prosecute the case on the initial referral, the Attorney General's Officer would later press charges for Invasion of Privacy pursuant to RSA 644:9.  Buteau Aff. ¶29.  Pelletier ultimately pled guilty to that charge and remains out of law

enforcement.

*Lawsuit and Declaration*

Shortly after the instant suit was filed Pelletier spoke with Plaintiff's Counsel. Pelletier Dep. at 64-65. Counsel then prepared a "Declaration" that Pelletier executed on January 12, 2022. *See* Pelletier Dep. 65 and Exhibit 13 to same. Plaintiff immediately dismissed Pelletier from the suit, with prejudice. *See* Notice of Voluntary Dismissal [Doc. No. 15].

In the attorney-drafted Declaration, Pelletier endorsed a series of statements not only implicating himself but seeming to cast blame on the Department. For example, Pelletier acknowledged that he knew Plaintiff had a disability and the conduct he recorded was a byproduct of it and declared that he shared the images "with indifference towards his disability." *See* Declaration ¶3. The document then added a series of statements attempting to characterize the Department as a whole, including:

- There was an attitude of resentment towards [Plaintiff], including in part because of his repeated admissions to the hospital on account of his mental illness.

- There was an environment at the Berlin PD that it was OK to share information about each other and/or closely worked with staff at the hospital that was not otherwise appropriate to share.

- It was well known throughout the PD that [officers shared information with hospital staff] but I am not aware of anything ever being done about it.

- There was also a general environment at the PD of being of the view that people like [Plaintiff] who are going through the IEA process have lesser rights than other citizens and so that also played a role in my thinking on January 22nd.

Declaration ¶5. Pelletier also agreed in the Declaration that the lack of discipline for sharing information "led me to develop the understanding that what I did on January 22, 2019 was not something I would be disciplined for. *Id*. He also related that in advance of the annual meeting at the Department "funny" body-cam moments were solicited and then displayed even though the audience would not otherwise have access to them. *Id*.

Finally, the Declaration recited that Pelletier had been involved in another incident where he "posted a picture of something work-related" that he was not supposed to and that "not much was done in response other than my corporal asking me to take it down." Declaration ¶6. The Declaration recited another complaint based on his conduct for which he was never disciplined. Declaration ¶7.

The spin on the facts set out in the Declaration was quickly and irreducibly shattered when Pelletier had an opportunity to elaborate on and contextualize the statements. For example, when asked about sharing information with hospital staff, Pelletier explained that the information being shared or discussed were observations that the nurses already observed themselves. Pelletier Dep. at 72. "You are up there talking with someone, and you both see something, you feel like you can talk about it," he intoned. *Id*. He would not, he testified, share information from the hospital with someone just on the street. *Id*. With respect to the Declaration statement that there was a general view at the Department that "people like [Pilotte] who are going through the IEA process have lesser rights than other citizens," Declaration ¶5, Pelletier explained:

> [H]e is not up there because he is sick and is just waiting for the hospital to fix him. He is up there because there is nowhere else to put him. He can't be by himself, and the IEA by definition takes away your right of that. That's what I mean by lesser rights. He is not a normal patient up there.

Pelletier Dep. at 73. Finally, where the Declaration implied that the Department had failed to discipline him for the complaints made by Jesse Chapman, at deposition Pelletier was crystal clear that the Department had followed up the complaint and that he (Pelletier) should "absolutely not" have been disciplined. Pelletier Dep. at 75-77.

Overall, Pelletier made clear that, notwithstanding the perception one might take from the Declaration, he had no memory of ever acting in the manner that he had that day (taking images of a mentally ill patient and sharing them with others) nor of anyone else posting any work

10

related pictures to social media. *See* Pelletier Dep. at 62-63. The other officers involved echoed this view. *See* Priest Dep. at 47 ("I'm not aware of anyone else sharing photos or anything like that at the Berlin Police Department."); Buteau Aff. ¶24. Although Benjamin received numerous Snapchats from Pelletier, no other one involved anybody with whom he was interacting. Benjamin Dep. at 62. ("It was always eating dinner, having food, walking the beat at night.") "I can definitely say I – I don't ever recall getting anything ever depicting someone he was ever dealing with at any certain time." Benjamin Dep. at 62.

They also disputed that there was an attitude of resentment towards Plaintiff, *see, e.g.,* Priest Dep. at 44 (denying attitude of resentment and clarifying that the resentment was towards the mental health system); Stapleton Dep. at 85 ("That's untrue. I would say that whatever frustration there was directed, and is still directed, at the mental health system, not the patient in general."); Howry Dep. at 39-40, or towards the mentally ill in general. *See* Howry Dep. at 43-44. Benjamin in particular was clear about his view of the Declaration drafted for Pelletier: "It's misleading is what I would say. It's definitely not – it's not accurate." Benjamin Dep. at 79-80.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment motions provide courts the opportunity to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Acosta v. Ames Dept. Stores, Inc.*, 386 F.3d 5, 7 (1st Cir. 2004) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992)). Thus, although the initial burden is upon the moving party to establish the lack of a genuine, material, factual

11

issue, *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the non-movant, *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir. 1988), if a motion for summary judgment is properly supported, the burden shifts to the non-movant to show that a genuine issue exists. *Donovan v. Agnew*, 712 F.2d 1509, 1516 (1st Cir. 1983). Failing that showing, summary judgment must be granted.

## ARGUMENT

Having quickly dismissed Pelletier from the case after obtaining his signature on the Declaration, Plaintiff's remaining claims (Counts II-IV) now run to the City only. The undisputed facts, however, establish that the City is entitled to judgment as a matter of law on each.

## I.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF THE COMPLAINT – PLAINTIFF'S *MONELL* CLAIM.

By Count I of the Complaint, Plaintiff broadly asserts that by recording and distributing images of him, Officer Pelletier violated "his constitutional rights to bodily integrity, privacy, equal protection, and due process, as guaranteed under 42 U.S.C. § 1983 and the fourteenth amendment to the United States Constitution." Complaint ¶23. By Count II of the Complaint, Plaintiff asserts that the City had in effect "de facto policies, practices, customs, and usages that were a direct and proximate cause of the unconstitutional conduct of the defendants. Complaint at ¶26. The reality, however, is that Pelletier's actions, albeit imprudent, did not actually violate any recognized constitutional right. Moreover, even if Plaintiff could establish such a violation, the undisputed facts demonstrate that the Plaintiff cannot sustain his burden of proof on his *Monell* claim.

### A.  Pelletier's Actions did not Violate Any Recognized Constitutional Right.

Although Plaintiff cites both 42 U.S.C. § 1983 and the Fourteenth Amendment in his

claim against Pelletier, only the latter provides any substantive ground for relief. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989) ("§1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (citations omitted). Rather, liability under §1983 arises only where the plaintiff establishes both: (1) the existence of some federal statutory or constitutional right; and (2) its violation by a person acting under color of state law. *Watterson v. Page*, 987 F.2d 1, 7 (1st Cir. 1993). While it is far from clear that Pelletier was acting under color of law, *see Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995) ("acts of state officials in the ambit of their personal pursuits are not state action); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 836-37 (9th Cir. 1996) (officer acting outside scope of employment and not under color of law acts as private citizen), the lack of an underlying constitutional violation alone defeats Plaintiff's claim.

Of the federal rights cited by Plaintiff – "bodily integrity, privacy, equal protection, and due process" – three are easily resolved adversely to Plaintiff. Claims invoking a constitutional right to bodily integrity fall within the penumbra of substantive due process and, consistent therewith, require a violation that "shocks the conscience." *See Albright v. Oliver*, 510 U.S. 266, 271-72 1994) (explaining scope of substantive due process claims to include "the right to bodily integrity"). Such claims uniformly involve allegations of sexual assault or internal bodily searches. *See, e.g., E. D. v. Sharkey*, 928 F.3d 299 (3rd Cir. 2019) (plaintiff sufficiently alleged a plausible violation of her Fourteenth Amendment due process right to bodily integrity in asserting duty to protect detainee from sexual assault); *Spencer v. Roche*, 659 F.3d 142 (1st Cir. 2011) (discussing scope of bodily searches). Absent such an allegation, the right to bodily integrity provides no avenue for recovery for Plaintiff.

Nor can Plaintiff fall back on a more general claim of substantive due process. As

repeatedly noted by this Court, "the hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe, so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Kiernan v. Hudson*, 2015 DNH 18 at p.7 (quoting *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010)). Substantive due process cannot be successfully invoked simply because simply because someone "cloaked in statutory authority causes harm." *Id.* at pp. 7-8 (citing *Sacramento v. Lewis*, 523 U.S. 833, 848 (1998)). Even "despicable and wrongful" police conduct is insufficient to carry such a claim. *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991) (repeated threats to kill plaintiff and further threat to children that they would never see their father again failed to state a claim under substantive due process clause).

The First Circuit catalogued the behaviors that meet the high threshold for such claims in a passage oft cited by this Court:

> Among the cases in which plaintiffs have prevailed [on substantive due process claims] are those involving a student blinded in one eye when a coach intentionally struck him in the head with a metal weight; a teacher's fabrication of sexual abuse charges against a father, resulting in loss of contact with his child for three years; rape by a police officer in connection with a car stop; a 57–day unlawful detention in the face of repeated requests for release; police officers aiding a third-party in shooting the plaintiff; an intentional assault by a police officer who struck a pretrial detainee twice in the head and threatened to kill him; and a principal forcing his way into a room where a student was hiding, grabbing her from the floor, throwing her against the wall, and slapping her.

*Cummings v. McIntire*, 271 F.3d 341, 346 (1st Cir. 2001) (quoted in *Spencer v. Doran*, 2020 DNH 147, at p.15, among others). Recording images of Plaintiff and distributing them to a handful of people, albeit improper, simply does not meet that threshold.

Finally, Plaintiff has not alleged, nor could he have, that he is a member of any protected

class for equal protection purposes. To the extent he intends to pursue a claim as a "class of one," Plaintiff must show that he has been intentionally treated differently than others similarly situated with no rational basis for such treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In addition, he must show that such treatment was "based on a malicious or bad faith intent to injure." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006).

As this Court noted in *McCoy v. Pittsfield*, 2021 DNH 158, Plaintiff "bears the 'burdens of production and persuasion' to identify – 'backed by competent evidence' – 'instances where persons similarly situated in all relevant respects were treated differently.'" *McCoy* at pp. 21-22 (quoting *Cordi-Allen v. Conlon*, 494 F.3d 245, 250-51 (1st Cir. 2007) (quoting in turn *Buchanan v. Maine*, 469 F.3d 158, 178 23 (1st Cir. 2006)). Plaintiff has not even alleged that similarly situated people were treated differently than he was. Moreover, even were he to establish such comparators, cannot show the requisite *mens rea*: The Declaration drafted by Plaintiff's own counsel and signed by Pelletier only claims indifference to Plaintiff's condition – not malice or bad faith intent to injure. *See* Declaration at ¶3. Absent some other evidence that Plaintiff was intentionally treated differently than others, in bad faith, Plaintiff's equal protection claim fails.

This leaves Plaintiff's sole potential source of a federal claim one for invasion of privacy. Here, too, the law is against him. As we have been recently reminded, "[t]he Constitution does not explicitly mention any right of privacy." *Roe v. Wade*, 410 U.S. 113, 152 (1973)). *See also Edwards v. City of Goldsboro*, 178 F.3d 231, 253 (4th Cir. 1999) ("there is no general constitutional right to privacy"). Indeed, whether any such right survives *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022), remains to be seen. Even before *Dobbs*, however, whatever invasion of privacy right existed it did not extend to distribution of even intimate recordings or images.

*Davis v. Bucher*, 853 F.2d 718 (9th Cir. 1988), is directly on point.  There, a corrections officer viewed and shared with at least two inmates nude photos of the plaintiff's wife.  He also made derogatory comments about her anatomy.  The plaintiff and his wife brought suit pursuant to 42 U.S.C. § 1983.  The District Court granted summary judgment to defendants, holding that no constitutionally protected privacy interests were implicated by the incident.  853 F.2d at 719. The Ninth Circuit affirmed.  In doing so, the court noted that the Supreme Court "has repeatedly cautioned federal and state courts against enlarging the 'commodious' contours of section 1983 and the Fourteenth Amendment so as to displace state tort law."  *Id*. at 720.  The court also observed that "the central mission of both section 1983 and the substantive component of the due process clauses is to provide redress for, and deter, abuse of governmental authority."  *Id*. Finally, the court recognized that the Supreme Court had warned courts that they "should be circumspect in 'expand[ing] the substantive reach of th[e Due Process] Clauses, particularly if it requires redefining the category of rights deemed to be fundamental.'" *Id*. (quoting *Bowers v. Hardwick*, 478 U.S. 186, 195 (1986)).

With these tenets in mind, the Court determined that the plaintiff's injury was "not one of constitutional magnitude."  853 F.2d at 720.  Rather, the claim was one that fit "squarely within the ambit of state tort law protections."  *Id*.  "The mere fact that Bucher was clothed in official garb cannot transform his act into one of constitutional significance."  *Id*.  Rather, the actions were "isolated instances of poor judgment."  *Id*.

So, too, here.  Pelletier certainly exercised poor judgment in recording images of Plaintiff and sending them to two officers in the department.  His actions, however, sound in tort, not in a violation of constitutional rights.  *See Carroll v. Parks*, 755 F.2d 1455 (11th Cir. 1985) (publication in high school yearbook of photo of cross country runner with his penis exposed,

along with the caption "Now that's competition," may be viewed as "deplorable, reprehensible, and insensitive" but did not state a constitutional claim); *Edwards*, 178 F.3d at 253 (pre-*Dobbs* Fourth Circuit held that right to privacy was "limited to matters of reproduction, contraception, abortion, and marriage"). As such, Plaintiff's claim against Pelletier would fail and, therefore, so does his claim against the City.

### B. Federal Claims Against Municipalities Are Strictly Limited to those that Directly Arise from a Policy or Practice of the Town.

As noted, absent a constitutional violation by Pelletier, the City cannot be liable under § 1983. Even if Plaintiff could establish a constitutional violation by Pelletier, however, the City is not liable absent showing that Pelletier's conduct was the <u>direct result</u> of the Department's own practices or policies: This Plaintiff cannot do.

"It is by now axiomatic that the doctrine of *respondeat superior* does not apply to claims under section 1983." *Gaudreault v Salem, Mass.*, 923 F.2d 203, 209 (1st Cir. 1990) (citing *Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir. 1985)). A municipality or its supervisory personnel can be held liable for the constitutional misconduct of its employees **only** on the basis of an "affirmative link" between their acts and those of the offending employee. *Id.* In order to establish municipal liability, the Plaintiff must do more than merely establish the Town was somehow negligent in its training or supervision of the officer but must show that the acts or omissions of the municipality's policymakers evidence "deliberate indifference" to the rights of its inhabitants. *Id.* (citing *Canton v. Harris*, 489 U.S. 378, 387-90 (1989)).

More particularly, the Plaintiff must establish that:

(1) a municipal policymaker intentionally adopted a policy, implemented a training protocol, or allowed a custom to develop; (2) the challenged policy, training protocol, or custom caused a violation of federally protected rights; and (3) the policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the policy, training, protocol, or custom.

*Penney v. Town of Middleton*, 888 F. Supp. 332, 340 (D.N.H. 1994); *accord Canton*, 489 U.S. at 385-92. "[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986).

Where plaintiff assert that the violation does not arise from written police but rather a "custom or practice" of the municipality, the custom or practice must be "so well-settled and widespread that the policy-making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end it." *Walden v. City of Providence*, 596 F.3d 38, 57-58 (1st Cir. 2010). *See also Hewes v. Belknap County*, 2018 DNH 24, at 7 (quoting *Pliakos v. Manchester*, 01-cv-461-M (DNH July 15, 2003)) (plaintiff must typically establish "a pattern of constitutional violations that has put the municipality on notice that its training is deficient" and a showing that, notwithstanding being on such notice, the municipality failed to implement changes). Consistent with the high burden, proof of a single incident of unconstitutional activity insufficient to impose liability on town without proof that it was caused by municipal policy. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

Here, Plaintiff cannot establish any actual written policy gave rise the alleged violation of his constitutional rights. To the contrary, the undisputed facts demonstrate that the Department had multiple policies that would prohibit the conduct Pelletier engaged in, including not only a general Rules of Conduct, but specific policies on Mental Illness and Social Media. Thus, Plaintiff can only establish municipal liability by showing that that there was a "well-settled and widespread" practice of such conduct.

Here, however, Plaintiff at best might argue that a single officer violated his rights on a

single occasion.  There is no evidence that any officer engaged in any similar misconduct prior to his incident, much less a "wide-spread practice" of such conduct.  In addition, even were Plaintiff to conjure such evidence, Plaintiff cannot show that the City was on notice of such previous violations.  The Department had (and still has) no information that Pelletier nor anyone else had recorded or shared images of a mentally ill person, unclothed or not.

Far from having a policy or practice that is <u>deliberately indifferent to a strong likelihood that the Plaintiff's rights would be violated</u>, the City has policies, procedures and training which properly instruct officers to respect those with mental illness and prohibits the type of conduct at issue here.  The Social Media SOP expressly forbids the posting or sharing of such images.  The Department has enforced the policy even on lesser infractions, as it did when Pelletier published a photo of <u>himself</u> on social media.  Indeed, Pelletier's own discipline in this case is evidential.  Before any outside agency was involved the Department investigated the incident, referred Pelletier for possible criminal investigation, and terminated him.  That process refutes the claim at the Department acted with deliberate indifference to Plaintiff's rights.

## II.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT III OF THE COMPLAINT – PLAINTIFF'S ADA CLAIM.

Plaintiff cannot prevail on Count III because he cannot show that the City intentionally discriminated against him because of his disability.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To establish a violation of Title II, a plaintiff must show:

(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3)

that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Buchanan v. Maine*, 469 F.3d 158, 170-71 (1st Cir. 2006); *see also Gray v. Cummings*, 917 F.3d 1, 15 (1st Cir. 2019).[2]

A plaintiff can press several different types of claims of disability discrimination under Title II. *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014). A plaintiff can assert disparate treatment on account of disability, i.e., that the disability actually motivated the defendant's challenged adverse conduct. *Id.* at 144-45. Alternatively, a plaintiff can claim that a government policy, though neutral on its face, "fall[s] more harshly on one group than another and cannot be justified by business necessity." *Id.* at 145 (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003)). Finally, a plaintiff can claim that a public entity has refused to affirmatively accommodate his or her disability where such accommodation was needed to provide "meaningful access to a public service." *Id.* (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273-76 (2d Cir. 2003)).

Here, Plaintiff alleges that Pelletier and the City discriminated against him on the basis of his disability because Pelletier would not have recorded or distributed images of Plaintiff but for the fact that Plaintiff was engaged in unusual behavior stemming from his mental and psychological impairments. Doc. 1 ¶¶ 36-45. Plaintiff is thus pursuing a discrimination claim of the first type, *i.e.*, a claim of disparate treatment on account of his disability. With Pelletier voluntarily dismissed from the action, of course, Plaintiff's Title II discrimination claim now lies solely against the City.

---

[2]    For purposes of the summary judgment analysis, the City does not contest that Plaintiff is a "qualified individual with a disability" and that the City is a "public entity," as those terms are defined under the ADA. 42 U.S.C. §§ 12131(1) & (2).

Claims of this first type – that the public entity's adverse conduct was actually motivated by the disability – are governed by the same analytical framework governing claims of racial discrimination under Title VII of the Civil Rights Act of 1964. *Nunes*, 766 F.3d at 144-45 (*citing Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) and *Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002)). Thus, for a disparate treatment claim, a plaintiff must present evidence that "animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Middletown*, 294 F.3d at 49 (discussing the first prong of the burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Plaintiff is incapable of demonstrating a prima facie case of direct liability against the City for disparate treatment. Plaintiff cannot show – nor does he even allege – that the City's decision-makers acted in any manner toward Plaintiff on January 22, 2019, let alone with animus for his disability. *Middletown*, 294 F.3d at 49. There is not even evidence that the City acted with deliberate indifference to a likely violation of Plaintiff's federally protected rights under the ADA. *See Gray*, 917 F.3d at 19. Plaintiff can adduce no evidence, for example, that the City's "existing policies caused a failure to adequately respond to a pattern of past occurrences of injuries like [his]." *Id.* (citing *Haberle,* 885 F.3d at 181) (internal quotations omitted). Likewise, Plaintiff lacks evidence "that the risk of … cognizable harm was so great and so obvious" as to override the requirement of demonstrating a pattern. *Id*.

To the contrary, the undisputed evidence is that City's decision-makers had nothing to do with any of the events of January 22, 2019. Plaintiff's claim rests entirely on the conduct of a lone police officer who exercised poor judgment, but that is not conduct for which the City is

responsible.[3]  The City maintained and enforced policies aimed not only at preventing disability discrimination by its officers but also prohibiting officers from using cell phones and social media in ways that could compromise confidential information or the privacy rights of those with whom the officers interact.  The City also regularly sent officers to outside trainings on various subjects and, in fact, it sent Pelletier to a full day class on dealing with emotionally disturbed persons in 2016.

For his part, Plaintiff can point only to the Declaration his counsel wrote for Pelletier, which does nothing to demonstrate animus by City decision-makers, and only vaguely stabs at the notion Pelletier acted with indifference toward Plaintiff.  While the Declaration perhaps provides hazy support for the proposition that officers had previously ignored City policies governing cell phone usage, nothing in it demonstrates "a pattern of past occurrences of injuries *like the plaintiff's*."  *Haberle*, 885 F.3d at 182 (emphasis in original).  Indeed, when clarifying the declaration statements at his deposition, Pelletier admitted that neither he nor to his knowledge anyone else had ever acted in the manner that he had, *i.e*., recording images of a mentally ill patient and sharing them with others.  Pelletier's Declaration certainly offers no support for the proposition that the City knew of circumstances that created a risk of an ADA violation "so patently obvious that [the City] could be held liable" without "a pre-existing pattern of violations."  *Id*. (quoting *Connick v. Thompson*, 563 U.S. 1, 63 (2011)).

Accordingly, summary judgment should be granted to the City on Plaintiff's Count III.

---

[3]    Plaintiff does not allege that the City is vicariously liable for Pelletier's actions on a theory of respondeat superior, nor could he.  While in *Gray* the First Circuit acknowledged that the question of vicarious liability under Title II remained open, 917 F.3d at 17, since *Gray's* publication in early 2019, numerous courts have examined whether vicarious liability is available under Title II, and many have concluded that it is not.  *See, e.g*., *Ingram v. Kubik,* 30 F.4th 1241, 1256-59 (11th Cir. 2022) and *Jones v. City of Detroit,* 20 F.4th 1117, 1118 (6th Cir. 2021); *cf*., *e.g., T.O. v. Fort Bend Indep. Sch. Dist*., 2 F.4th 407, 417 (5th Cir. 2021).

**III.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT IV OF THE COMPLAINT – PLAINTIFF'S NEGLIGENCE CLAIM.**

Plaintiff's final claim is captioned "Voluntary Assumption of Duty" and appears to be based on the allegation that that Defendants "voluntarily assumed a duty to protect [Plaintiff] from harm . . . when they undertook to the duty to detail [sic] and provide one-on-one observation of [Plaintiff]" at AVH.  Complaint ¶47.  Setting aside the questions of whether the City actually agreed to provide "one-on-one observation" of the Plaintiff, much less that such an agreement would create a duty of care to Plaintiff, the City cannot be liable for such a claim by state law.

Through its various provisions, RSA 507-B bars all bodily or personal injury claims against municipalities unless: (1) separately provided by statute or (2) the claim arises out of the "ownership, occupation, maintenance or operation" of motor vehicles or premises.  Specifically, RSA 507-B:5 provides for broad municipal immunity declaring:

> No governmental unit shall be held liable in any action recover for bodily injury, personal injury or property damage **except** as provided by this statute or as is provided or may be provided by other statute.

RSA 507-B:5 (emphasis added). RSA 507-B:2 then defines precisely the limited actions that are permitted against governmental units under the statute, providing in pertinent part:

> A governmental unit may be held liable for damages in an action to recover for bodily injury, personal injury or property damage caused by its fault or fault attributable to it, arising out of ownership, occupation, maintenance or operation of all motor vehicles, and all premises . . . .

RSA 507-B:2.

As the New Hampshire Supreme Court noted in *Dichiara v. Sanborn Regional School District*, RSA 507-B was specifically enacted by the legislature in response to the Court's earlier decision abrogating municipal immunity.   165 N.H. 694, 697 (2013) (citing *Merrill v. Manchester*, 114 N.H. 722 (1974)).  The statute was "designed to limit municipal liability arising

from tort suits." *Id.* (quoting *Cannata v. Town of Deerfield*, 132 H.H. 235, 243 (1989)).  As such, the Court concluded, "we will not interpret RSA 507-B:2 as expanding municipal liability." *Id.*  Rather, "RSA 507-B:2 provides an exception to RSA 507-B:5 only when there is a nexus between the injury and a governmental unit's ownership, occupation, maintenance, or operation of a motor vehicle or premises." *Dichiara*, 165 N.H. at 696-97.

Importantly, the definition of "personal injury" expressly encompasses the claims asserted here.  *See* RSA 507-B:1 III. ("Personal injury" means (a) Any injury to the feelings or reputation of a natural person, including but not limited to, false arrest, detention or imprisonment, malicious prosecution, libel, slander, or the publication or utterance of other defamatory or disparaging material, <u>invasion of an individual's right of privacy</u>, invasion of the right of private occupancy, wrongful entry or eviction, <u>mental injury, mental anguish, shock</u>, and, except when against the public policy or the laws of New Hampshire, or both, discrimination) (emphasis added).  As Plaintiff's claim does not arise from the City's ownership, *etc*., of motor vehicles or premises and he does not assert any other statutory basis for his tort claim, he cannot recover against the City on this Count.

## CONCLUSION

Officer Pelletier was undeniably wrong to record and distribute images of Mr. Pilotte and has properly paid a serious penalty for doing so.  Under the law, however, the City is not liable for his actions.  As such, Defendant is entitled to judgment on all claims.

Respectfully submitted,

**CITY OF BERLIN**

By its Attorneys,

Cullen Collimore Shirley, pllc

Dated:  December 2, 2022      By: /s/ Brian J.S. Cullen

                         Brian J. S. Cullen
                         NH Bar No. 11265
                         37 Technology Way, Suite 3W2
                         Nashua, NH  03060
                         (603) 881-5500
                         bcullen@cullencollimore.com

## CERTIFICATE OF SERVICE

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated:  December 2, 2022      By: /s/ Brian J.S. Cullen

                         Brian J.S. Cullen