UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

*************************************

ALFRED PILOTTE, through his Guardian

THE OFFICE OF PUBLIC GUARDIAN

VS NO: 21-CV-00749

BERLIN POLICE DEPARTMENT

**************************************

DEPOSITION OF PHILIP PELLETIER

This Zoom deposition taken by agreement of counsel, on October 28, 2022, commencing at 2:21 p.m.

Q And how long have you lived there?
A From 2014.
Q Any plans to move in the next year or so?
A In the next year? Probably not.
Q I take it since you believed that this case was over, at least your part was over, you didn't notice until recently that the case was still scheduled for trial in April of '23?
A You broke out a little bit. I think you asked I didn't know it was scheduled for trial, and the answer to that would be, no.
Q In addition to speaking to Mr. Carr, did you review any documents to prepare for today?
A No, I don't have anything with me anymore to review.
Q You understand that the deposition is concerning a case brought by Mr. Pilotte who alleges that you took images of him at the Androscoggin Valley Hospital in January of 2019, correct?
A That is my understanding.
Q Do you still have any images of Mr. Pilotte on your phone or any other device?

A No, I do not.
Q Do you know anybody who has those images?
A No, I do not.
Q I am going back to sort of the background section then.
Did you grow up here in New Hampshire?
A Yes, I did.
Q High school in Berlin?
A Yes, I did.
Q What year did you graduate?
A 2007.
Q I understand you went into the Marines?
A Yes, I did.
Q Was that immediately after graduation from high school?
A It was about a year after.
Q And in that year from 2007 to 2008, what did you do?
A I was employed by Isaacs Construction and Steel and waited for my son to be born.
Q And once he was born, that is when you went to the Marines?

A Correct.
Q And how long did you serve in the Marines?
A Four years.
Q Was that all full-time, or was any of that as a reservist?
A All active duty.
Q Any deployments in that four-year period?
A Yes.
Q Where were you deployed, sir?
A I can't talk about one. I went to Afghanistan and MEU, Marine Expedition Unit.
Q And your time in Afghanistan, was that in a combat role?
A Yes, it was.
Q Did you receive any discipline while you were in the Marine Corps?
A I don't see how that would be relevant to this, but no, I did not.
Q I take it you got an honorable discharge?
A Yes, I did.
Q And when you finished active duty, did you remain in reserves or have any other commitments in the Marines?

A Just inactive reserves, which you have to update your information, and that is it.
Q And in the inactive reserves for a period of time, you could be called back up?
A That's correct.
Q Is that still true today?
A No.
Q What are you doing now, sir, for employment?
A I am a lineman apprentice.
Q And who is that with?
A A 104 contractor, currently working for a three-phase line company.
Q I think that cut off a little bit.
Did that just cut off for me or everybody?
MR. CARR: I think it might just be on your end with the connection.
THE WITNESS: I can move from here into my office, if the connection stays unstable.
Q I understand, Mr. Pelletier, that one of your sisters works in law enforcement, or did at one time as a dispatcher?

Page 14

A Yes.
Q Where did she work?
A She worked for Troop F State Police.
Q Are any of your other siblings in law enforcement, or have they been?
A No.
Q Your father was also in law enforcement?
A Yes.
Q I understand he started at Berlin Police Department?
A Yes.
Q And then went into the state police?
A Yes.
Q And eventually became the chief of police in -- was it Groveton?
A Groveton, Northumberland, yes.
Q Is he still chief there?
A Yes, he is.
Q Did you ever talk to your dad about the Pilotte incident?
A Of course, I have.
Q Did you talk to him about back, at the time when you first learned that you were being

Page 15

investigated relative to it?
A Yes.
Q Did he give you any advice as to whether you should contest the discipline or submit a resignation?
A I am not comfortable answering that. We spoke as father and son and not looking for answers from a chief of police. I am not trying to be rude. I am trying to be as up front with you as possible.
Q I get to ask a lot of different questions at the deposition. I am going to move on from that one. I just want you to know I am not going to move on from all of them.
A I understand.
Q If we get to points where we really disagree, you know, eventually I would have to try to seek to suspend the deposition, and we will go from there. I don't think we are there yet. Let me move on from that for the time being.
Tell me when you finished with the Marines as active duty, what did you do?
A I came back and worked for a small security

Page 16

company and applied to police departments.
Q How long was it after you returned from active duty before you landed a job in law enforcement?
A Six months, I believe.
Q And who was it that you got that first job with?
A Gorham, New Hampshire.
Q Can you give me the year that would have been?
A 2013.
Q Was that a full-time position or part-time?
A Full-time.
Q I am going to just try to move this over into my office where the connection will be a little bit better. Bear with me for a second everyone as I make that move.
(Short recess.)
Q (By MR. CULLEN:) Thank you for your patience there.
I missed your last answer, sir. Was it part-time or full-time?
A Full-time.
Q Full-time?

Page 17

A Yes, sir.
Q And with respect to that position, I take it you had to go to the academy?
A Yes, I did.
Q What was your graduation class at the academy?
A 163, 164. I don't remember.
Q Do you remember how long the academy was back then? Was it 16, 17 weeks?
A 16 -- 14 or 16.
Q When you returned from the academy, did you go through any additional training at Gorham?
A I don't think so. I believe my FTO period was over.
Q You did your FTO before the academy?
A Yes.
Q How long was the FTO period?
A I don't know. From when I was hired until I left for the academy, a couple months.
Q And what did that consist of?
A On-the-job training.
Q I take it you rode along with a more senior officer?
A Yes.

Page 18

Q You went over the Gorham SOPs?
A Yes.
Q Did you have additional training in Gorham, that you recall?
A I don't remember.
Q In 2014, I understand you became a special enforcement officer with Berlin PD?
A I don't know what a special enforcement officer would be. I didn't go to Berlin until 2015.
Q Let me just -- it is not a memory test. I have some documents, let me see if I can pull one of them and maybe it will help.
A I see it.
Q Are you seeing something that says Pelletier Exhibit 1?
A Yes.

(Whereupon, the court reporter marked Exhibit Number 1, Employee Status Notification Form A, for Identification.)

Q Mr. Pelletier, looking at this Police Standards and Training, there is a listing on box 7 which is three down from the upper left

Page 19

that says special enforcement officer, effective 7/1/14, which is box 6.

Does that refresh your recollection as to whether maybe you took a part-time position with Berlin for some period of time?
A Yes, I see the part-time box checked off. I didn't realize I was on a list called special enforcement. I thought that was like their retired guys. I would have been just an on-call part-time officer. That is how I would have classified it. I am sorry.
Q Fair enough. With respect to that position, what was your role with Berlin?
A If they couldn't fill a specific overtime detail, they would open it up to other officers, qualified to be able to fill it.
Q So you weren't doing patrols during that period of time as a part-time officer with Berlin? You were primarily covering details?
A Yes.
Q Do you recall if during that part-time period before becoming a full-time officer with Berlin, whether you had any encounters with

Page 20

Mr. Pilotte?
A I don't recall.
Q I am going to try this again, another document which has been marked as Exhibit 2.

(Whereupon, the court reporter marked Exhibit Number 2, Employee Status Notification Form B, for Identification.)

MR. CARR: I'd like to see how Becky is getting down the record. You're doing the robot voice again with the glitch, a little bit.

For the most part, I think she is able to get everything. If it is weird, I will let you know.

Q Mr. Pelletier, showing you what has been marked as Pelletier 2, this is an employee status notification form B, and it records that you have been assigned from a part-time to a full-time position. It looks as though it is effective from August of 2015.

Is that consistent with your memory of when you joined Berlin full-time?
A Yes.

Page 21

Q When you -- what brought that change from Gorham to Berlin? What prompted you to make that move?
A It was a better position for me at the time.
Q And was it better pay, better opportunity?
A It was a multiple amount of reasons like that. Schedule, pay.
Q And when you joined Berlin, did you go through any sort of abbreviate FTO period?
A Yes, I did.
Q Do you recall how long that was?
A I don't know. A couple weeks.
Q Do you remember was it just one person or was it with multiple officers?
A I believe it was only with Nathan Roy.
Q What did the FTO period, that abbreviated period, consist of?
A Learning Berlin, their SOPs and how they did things.
Q And growing up there, I suppose you didn't have to spend quite as much time learning the streets, right?
A I knew where everything was. I just didn't

Q In those -- are you able to estimate how many times you saw Mr. Pilotte up at the hospital prior to January of 2019?
A I don't recall.
Q Do you think it was more than a dozen?
A I have no idea. That seems like a big number.
Q With respect to the times that you did see him prior to 2019, what was his behavior like when you encountered him?
A That was usually the same person when you are up there.
Q What does that mean?
A Nonresponsive. Doesn't want to talk to you or look at you.
Q When you are there on a detail, what is your role? What are your responsibilities?
A To keep the staff safe and then keep Alfred safe from himself.
Q And what would you do to keep the staff safe?
A I am there to make sure that nothing bad happens to him. Like if they have to give him medication, I would go and make sure Alfred is not yelling and not in physical contact with

them any more than he has to be.
Q Do you remember any patients in which Alfred Pilotte assaulted anyone at the hospital in your presence?
A Not in my presence.
Q Were you aware of him doing that outside of your presence at any time?
A Yes.
Q What was that?
A I think he has assaulted a few officers and a few staff members, but I don't know the names, I don't remember.
Q But this would have been prior to 2019?
A I don't remember if anything happened in 2019, but yes, prior.
Q Do you recall any of the officers in particular who you had heard were assaulted by Mr. Pilotte at some point?
A I don't remember who it was at this point.
Q And the same question with regard to staff, do you remember anyone specifically on staff?
A I don't remember.
Q At any time prior to January of 2019, had you

taken any -- recorded images of Mr. Pilotte?
A I don't remember.
Q You indicated that Mr. Pilotte was generally acting the same way, or he was always himself in the way you saw him every time he was at the hospital.
Did I characterize that right?
A Can you repeat that?
Q I am just trying to not get it wrong.
You mentioned something that Mr. Pilotte was always the same when you saw him up at the hospital regardless of when it was when he was there for either revocation or an IEA, am I getting that right?
A I mean, his general behavior, he doesn't interact, but inside that, he can be -- he can shout, and he can be quiet, sitting there. That is what I meant by his general behavior.
Q I understand. He is not doing the same thing every single time, but the over-arching characteristics are similar?
A Right, like he is obviously up there for a reason, and because he has violent tendencies,

which is why police have to be up there with him.
Q Is the door locked to his room locked at any time?
A Not that I am aware of.
Q I assume that he is always on his own in the room as far as like there are no other patients with him at any time?
A Correct.
Q Do you recall any specific statements that Mr. Pilotte ever made to you prior to January of 2019?
A No, I don't remember anything like that.
Q Do you recall him ever calling you a Nazi or anything like that?
A It wouldn't surprise me if he said that.
Q Why wouldn't it surprise you?
A Just kind of the way he speaks. I think he just sees things -- I don't know if this makes sense to you, just more old school, probably by the way the uniforms look. They are all black.
Q Did any other officers talk to you about the

A Nothing has been filed.
Q I am going to show you another document, Mr. Pelletier?
A All right.
Q I have marked as Exhibit 11, sir, an October 6, 2020 letter from Chief Morency addressed to you.
Do you have that in front of you?
A Yes, I do.
(Whereupon, the court reporter marked Exhibit Number 11, Letter from Morency to Pelletier, for Identification.)
Q Do you recall getting this letter?
A Vaguely. Yes, it looks familiar. I know what it is.
Q Is it fair to characterize it as a notice that you are being placed on the EES list by the chief?
A Yes, it is what it says.
Q Do you know if today you are on that list?
A I imagine once you are on, you can't get off.
Q Have you taken any steps to challenge the -- the last paragraph. Let me strike that.

The last paragraph of this indicates "Under section 4, I am giving you the opportunity to submit documentation for inclusion in your personnel file to indicate you are challenging the finding that the conduct is exculpatory if you so desire."
Did you bring any sort of challenge to your listing at the EES?
A No, I don't recall doing that.
Q Have you been notified at any time that there is a process by which you can challenge your inclusion on the EES list?
A I didn't really look it up. I thought it would be pointless.
Q Other than the -- after the detail at which you took at least a video of Mr. Pilotte at Androscoggin Valley, did you do any other details Androscoggin Valley Hospital with Mr. Pilotte?
A I don't remember.
Q Do you recall, when you recorded an image or images of Mr. Pilotte, do you recall his reaction to you doing so?

A No, nothing.
Q Did he give you any indication that he was aware that you were taking an image or images of him?
A No.
Q Do you recall Mr. Pilotte acting differently to you in any manner after the recording of an image or images of him?
A No.
Q In other words, from -- throughout January of 2019, do you ever recall his behavior changing in any recognizable way towards you?
A No, I don't remember, and I don't recall that.
(Whereupon, the court reporter marked Exhibit Number 12, Buteau memo, for Identification.)
Q Showing you this document, Mr. Pelletier, Exhibit 12 in this deposition, I wouldn't imagine you have seen this before, September 15, 2020 e-mail from a woman Allison Vachon, V-A-C-H-O-N to Daniel Buteau, B-U-T-E-A-U, referring to a prior discipline regarding social media, and there is a reference in

handwritten notes that says, "Bill Daisey. Pic of him in ERT gear. 2016 or 2017 Facebook."
In reviewing that, do you have any recollection of getting disciplined or counseled from Attorney Daisey with respect to posting a picture of you in ERT gear?
A He told me to take it down, and I did it, and that was it.
Q Is ERT, is that emergency reactive response?
A Emergency response team, yes, I believe that is what ERT stands for.
Q Is that equivalent to what we would call SWAT?
A Yes, yes.
Q And do you remember the image that it was that Bill Daisey asked you to take down?
A I don't.
Q Do you remember anything else Bill Daisey talked to you about with respect to that image?
A No.
Q And do you remember if, in fact, you did post an image like that on Facebook?

Page 34

way Mr. Pilotte treated them in the time prior to 2019?
A I don't remember.
Q Other than Mr. Pilotte, were there other people, and I don't need their names, were there other people that you did similar security details for at the hospital?
A Yes. It would be for either someone violent or if the hospital staff couldn't watch, they would ask the PD. There are probably a couple of occasions of that.
Q How did the details get assigned in January of 2019? How did it come that you were up there working a detail?
A If the time is available, you can sign up for it.
Q What happens if nobody signs up for a slot?
A You could get forced over or -- I believe they would -- if the shift had enough people, the shift could try and cover it.
Q Do you remember if you were ever forced over?
A I don't remember. Probably longer than I wanted to.

Page 35

Q Meaning your shift didn't really end because no one came in to relieve you?
A Yes.
Q If I am wrong when I try to characterize your testimony, please let me know. I am just trying to make sure I understand what I think you are saying. Okay?
A No, no problem. I am trying to remember. It is a long time ago, especially questions prior to everything after that.
Q So let's go to that January time frame itself.
My records indicate that Mr. Pilotte was brought into the hospital on January 21 of 2019, and I read your declaration in connection with your dismissal, and that indicates that the recording of images of Mr. Pilotte took place on January 22nd, 2019.
Does that -- is that consistent with your memory of the events?
A If that is -- if you had asked me before you just said that, I couldn't have told you the exact dates. I would have said the beginning of 2019. It is generally what I think.

Page 36

Q Within the hospital, is the -- was Mr. Pilotte's room on a special ward or was it -- where was it?
A No, it was right with everyone else.
Q And is that -- is that along a hallway or one of these nurses' stations where there is a nursing station in the middle, and then there are rooms all around it?
A It is like a longer hallway, like a T, kind of. The nursing station would be like at one of the crosses in the T. I know you can't see this. Just habit.
Q Once you get there to take on your shift, or your detail, is there a chair outside the room that you sit in?
A Yes.
Q Any other items that are there for your benefit?
A A table that I have a drink on or food.
Q When you do get relieved, is there any sort of transfer or transition between you and the next officer?
A Not that I remember. I would like to think he

Page 37

would just say if anything extravagant happened. If nothing, then nothing would happen.
Q And the same thing when you come in, when you come in, the departing officer would let you know if something unusual happened but otherwise, just say, thanks.
A Yes, pretty much.
Q How frequently would the staff check on Mr. Pilotte during a shift?
A I don't know.
Q Are these four-hour shifts or eight-hour shifts, or how long were your shifts up there?
A They could be -- I mean, whatever time slot is filled, they are available. Someone might do it after a shift and just do a couple hours in-between shifts or someone might use a whole day off and do one.
Q I am going to show you another document in a second here and ask you a few questions about it.
Mr. Pelletier, I should have in front of you an exhibit marked Pelletier 6,

Page 46

Q But you don't have a specific recollection of Officer Imperial sending you images of anyone that he had taken at the hospital?
A I don't remember.
Q Do you have any specific memories of any other officer sending you images that they had recorded at the hospital?
A I don't remember.
Q Back in 2019, did you also use the social media platform Instagram?
A Yes.
Q Do you know whether or not you sent images of Mr. Pilotte to anyone via Instagram?
A No, I do not.
Q Do you recall anybody responding to you when you sent the image of Mr. Pilotte?
A No, I don't remember.
Q Officer Howry, is he someone you would have considered yourself to be friends with back in 2019?
A Yes, we were friendly at work. I don't remember ever hanging out with him outside of work.

Page 47

Q Is he somebody that you would have sent an image of Mr. Pilotte to?
A I don't think so.
Q And why wouldn't you think so?
A I just don't think I would have.
Q Is that because you weren't as close to him as you were to Stapleton and Imperial and Benjamin?
A Yes.
Q When did you first learn that someone at a supervisory level had learned that you had taken images of Mr. Pilotte and distributed them to any single person?
A Stapleton told me.
Q And do you remember what he said to you?
A He said he had shown the image, the media, to Officer Priest, and a few days later, Officer Priest told him that he was going to report it.
Q Did Stapleton say anything else at that time?
A No.
Q What did you say back to Stapleton when he told you that?

Page 48

A I said, thanks for the heads up, and I will go talk to my supervisor.
Q And who was it that you went to talk to?
A It was -- my supervisor at the time was Tim -- Lieutenant Godin.
Q G-O-D-I-N?
A Yes.
Q And do you remember what your conversation with Lieutenant Godin was?
A We never had one. I had decided to wait until he spoke to me, and he never did.
Q Who was the next person who you spoke with about the incident?
A Lieutenant Theriault.
Q Did Lieutenant Theriault, did you give a statement or an oral statement to Lieutenant Theriault?
A No, how did that go? I had not heard anything in a long time, and I had thought it was over, and then I heard Lieutenant Theriault was asking that question to someone about it. I don't remember who, and so then I went and spoke to him.

Page 49

Q And what did he say?
A He just said that he was asked to ask information about it.
Q Did you speak to any of your fellow officers about conversations that they had with lieutenant Theriault?
A No.
Q I am sorry, I think that was no?
A No. Yes, it was no.
Q Thank you. Did you speak with an attorney at any time during the investigation into your conduct at Berlin?
A Not until after I had left the PD.
Q And how about a union rep, did you talk to a union rep about the investigation that was going on?
A Yes. He was present when I spoke to the chief, I believe.
Q Do you recall who that was?
A Wade Goulet.
Q Was that Wade Goulet?
A Yes, Wade Goulet.
Q Was the deputy chief present during that

conversation also?
A Yes.
Q The Deputy Chief Buteau?
A Yes.
Q When you went to speak with them -- let me share a document with you again so that I am not surprising you.
(Whereupon, the court reporter marked Exhibit Number 7, Employee Status Notification Form, for Identification.)
Q I will show you what has been marked as Exhibit 7, Pelletier 7. It appears to be another employee status notification form. It has a date, effective date of change of April 11, 2019, and if I look down at the circle that is dotted, it appears that it relates to a 7-day suspension.
Do you see that?
A Yes, I do.
Q Do you remember when you were informed that you were being suspended for 7 days?
A I don't.
Q Do you remember if it was in connection with

the investigation into your activities, vis-a-vis Mr. Pilotte?
A Yes.
Q Do you know if you were on suspension at the time that you met with the chief and deputy chief and Mr. Goulet?
A No, I wasn't.
Q You were not at that time?
A No.
Q The same question with respect to the written statement that you gave that was previously marked as Exhibit 6.
Do you know if you turned that in to the chief while you were suspended or prior to being suspended?
A I believe it was prior to being suspended.
Q At some point, did you believe that the 7-day suspension was going to be the full discipline for your actions?
A Yes, I did not know what was coming up.
Q When, if ever, did the chief or someone else inform you that they were going to recommend you for termination?

A Wade told me the day before I resigned.
Q Why did you decide to resign?
A He had recommended that I do it so that it wasn't -- my understanding at the time, so that it wasn't a resignation in lieu of termination to help retain my certification.
Q In-between your resignation -- following your resignation, did you apply for other law enforcement jobs?
A No, but I was offered several.
Q Why did you not take them?
A I didn't want to go to a department with anything over my head, if I wanted to make sure that I went there ready to go and not have something that they would have to go through with me, I guess. Go there clean.
Q After you had resigned, what was still over your head?
A Well, I was told that there was an external investigation.
Q A potential criminal investigation?
A Yes, they sent the case to be looked at from a different department.

Q Were you ever interviewed by another department?
A No.
Q Were you ever interviewed by the Grafton County Sheriff's Office?
A I spoke with several of their investigators because it changed hands, I believe, but nothing ever, formal interview. Basically just updating.
Q When did you first learn about criminal charges against you?
A I was in Idaho.
Q Working or on vacation?
A I was at school.
Q Was that school to be a lineman?
A Yes.
Q Were you represented by counsel in the criminal matter?
A Yes.
Q And who was that?
A Oh, shoot, what is his name? Eric.
Q Eric Wilson?
A Yes, thank you, Eric Wilson.

Page 62

A If Bill says that we spoke. I don't remember posting it on Facebook, but I mean obviously, it is there. It was years ago.
Q Other than that instance in which Bill said that he spoke with you, are there any other times where you posted information or photos of yourself on social media related to your work?
A I don't remember.
Q Do you recall if Officer Imperial ever posted images of himself on social media related to his work?
A I don't remember. I would have to check his profiles, I guess.
Q I am sorry, the answer was --
A I don't remember.
Q How about Stapleton, do you remember if Stapleton ever posted anything related to his work on social media sites?
A I don't remember.
Q The same question regarding Officer Howry, do you recall him ever doing such a thing?
A I don't think that Officer Howry had anything beyond a flip phone.

Page 63

Q And if I didn't ask already, how about Officer Benjamin, do you recall him posting anything on social media related to his work?
A I do not remember.
Q Do you remember anybody specifically posting work-related images on social media?
A I don't. It has been a long time.
Q I understand.
A I am really trying to move on and until you messaged me, I thought we had.
Q It sounds like the incident with Mr. Pilotte in January 2019 was the only time you did something like that.
Is that fair to say?
A I don't remember.
Q You don't remember anybody else doing something similarly?
A No. Their actions are their actions. I don't remember.
Q When did you first learn that you were named in a lawsuit by Mr. Pilotte?
A I don't know. 2020, maybe it was like the first notification that it was possible.

Page 64

Q Once you got a copy of the complaint, was that actually served upon you in some manner? Did the sheriff serve it? Did he show up at the door?
A I don't remember.
Q When you did receive it, do you remember what you did?
A No.
Q I know you had mentioned earlier, so I am trying not to repeat myself, I think you mentioned earlier, you thought about contacting counsel, but you didn't do that right away. At some stage, you contacted Attorney Carr?
A I don't remember when we first spoke.
Q Do you remember if you reached out to him or if he reached out to you?
A I don't remember.
Q Do you remember how many times you and Attorney Carr spoke?
A We spoke on the phone. I think he had called me. I don't remember if it was set up by e-mail first, and then we met in person once.

Page 65

Q I am going to show you a copy of a declaration that we received in this case.
Do you see that, sworn declaration of Philip Pelletier, marked as Exhibit 13?
A Yes, I do.
(Whereupon, the court reporter marked Exhibit Number 13, Sworn Declaration of Philip Pelletier, for Identification.)
Q Did you prepare this, or did somebody prepare this for you?
A I spoke it and Attorney Carr, Anthony, typed it out.
Q For instance, in paragraph 1, I see it says, and I am six lines down, you can probably see my cursor "He also specifically went over New Hampshire Rules of Professional Conduct Rule 4.3 with me."
I take it that is attorney writing, not Phil Pelletier writing, right?
A Yes, he told me what that meant, what he put that in there was to go over what he had spoke about from the beginning.

Page 70

Q (By MR. CULLEN): I want to keep the declaration up on the screen and ask you a few questions about it.

In paragraph 4, you state that "There was an attitude of resentment towards Alfred, including, in part, his repeated admission to the hospital on account of his mental illness, which required most of us to serve on these details even when he would be there for weeks at a time."

Who specifically conveyed to you an attitude of resentment towards Mr. Pilotte?

A Anyone who did the detail really. I mean, it was -- I apologize for slouching. More just the fact that he is up there constantly, and when he is up there, there is no actual help getting to him, because he is not in the State Hospital. He is just being held, you know. And because he is up there being held for weeks at a time, it puts everyone in a bind to have to fill all of that time slot up.

Q I believe Officer Stapleton, although it may have been a Priest or someone else, I think it

Page 71

was Officer Stapleton testified earlier that the frustration that he felt was directed towards the system that didn't allow Mr. Pilotte to get any real mental health treatment during this time when he said he would be waiting sometimes for weeks.

Was that a feeling that you shared?

A Yes. Sorry, I didn't wait for your question.

Q You did a good job. It was a long question.

Was that the real basis over the frustration specifically with Mr. Pilotte himself as an individual?

A He wasn't really a joy to be around. Beyond that, that was pretty much it.

Q On paragraph 5, you write, "There was an environment in PD, that it was okay to share information among each other and/or closely worked with staff at the hospital that was not otherwise appropriate to share."

What examples do you have of information being shared with officers that wasn't appropriate?

A I guess you would have to define what is

Page 72

inappropriate. I mean, you are up there, and you have that feeling of -- what is the term that you use -- it is not imputed knowledge. That doesn't sound right, but because you are all working up there in that environment, you are exposed to it anyway. You are not divulging anything that you can't already divulge. Does that make sense?

I am not going to walk up to the person on the street and talk to them about something I just saw in the hospital the same as you would. You are up there talking with someone, and you both see something, you feel like you can talk about it.

Q You telling a nurse what is going on in Mr. Pilotte's room, wouldn't necessarily be conveying to that nurse information that he or she didn't already know firsthand, is that what you are saying?

A Yes.

Q The paragraph goes on, and I will try, if you can see my cursor, I was going to start with this, there was also a general environment at

Page 73

the PD of being of the view that people like Alfred who are going through the IEA process have less rights than other citizens and that also played a role in my thinking on January 22nd.

What do you mean by that?

A That he is not up there because he is sick and is just waiting for the hospital to fix him. He is up there because there is nowhere else to put him. He can't be by himself, and IEA by definition takes away your right of that.

So that's what I mean by lesser rights. He is not a normal patient up there. He is only there because the State Hospital chooses not to accept him immediately, whether by -- sorry, using my hands -- by space or data list.

Q And going down that paragraph, at the last sentence on this page, it reads, "For example, in advance of the annual PD meeting, the Berlin PD asks officers to submit funny body cam moments and then display at the meeting for people."

I am going to see if I can get to the next page here.

I'll continue, "some of whom would never have otherwise had access to the footage and/or legitimate reason to do so."

Do you remember any specific body cam moments that would fit into that category that you are describing here?

A I don't remember anything specific that was shared, because at the time that is what they did.

Q One of the officers testified that such moments included officers slipping on ice or officers confronting animals.

Are those the type of video camera moments that you recall?

A Yes, that would be included.

Q What else would be included that you can remember?

A I think there was a moment people shared a video when someone had, what is the polite word, defecated on city hall, because he was intoxicated. I believe that video got shared

around the PD.

Q Was that video of the -- was that video of the poop itself or was that video of the person taking -- doing the defecations?

A It was the whole thing.

Q And any other examples like that that you can remember, any other experiences like that that you remember?

A I don't remember.

Q You will be happy to know, this is close to the end of my questions on this document.

There is a reference on this page to an incident involving Jessie Chapman. Who is Jessie Chapman?

A Jessie Chapman, my opinion of him, he is a self-proclaimed like security guard per his father.

Q What did he accuse you of?

A He was upset, I thought he was like following around scanners, looking for police activity, and he would drive by, and I called him out on that one night, and he was upset that I did that.

Q So it appeared that he was showing up at police scenes, is that what was happening?

A Yes, he was.

Q And when you said you called him out on it, what specifically did you do?

A He was driving up towards a scene I had just left. I don't remember what it was, but it was pretty serious, and I was not in a great mood about it, and I noticed him coming up, and I kind of pulled him over but from the front, and which is just like put my lights on and kind of got in his way so that he was stopped, and then I told him that he didn't need to be around, and he needed to just stay away from anywhere where we are working.

Q Did Chapman have any other complaints against you?

A I don't know.

Q You didn't get into any trouble as a result of that complaint?

A No. The chief told me that he spoke with his dad. I had actually worked with his father previously. I had a good relationship with

him, and they said it was nothing.

Q So the chief told you basically he followed up and that was the end of it?

A Correct.

Q Do you feel like you should have been disciplined for your conduct?

A Absolutely not.

MR. CULLEN: Those all the questions I have for you, Mr. Pelletier. I appreciate you coming in. I can't promise Anthony Carr doesn't have any. Those are all the ones I have at this time.

THE WITNESS: We could have powered through.

MR. CULLEN: Sorry, I had other questions, but since it appears you don't live in Florida and actually live in Manchester, I am not quite as concerned about finding you again.

THE WITNESS: That doesn't comfort me, and I don't live in Manchester. My residence is in Berlin.

MR. CULLEN: I apologize. Close